LAUREN MOSS and ALEXANDRIA    )
WHITE, as next of kin of    )
PAUL D. MOSS, II    )
    )
      Plaintiffs,    )
    )
    )    JURY DEMAND
v.    )    Case No.:_____
    )
ANDERSON COUNTY;    )
RUSSELL BARKER; DENVER    )
WADDELL; CHRISTOPHER CONNER;    )
WHITNEY DAVIS;    )
CITY OF JELLICO; GARY PERKINS;    )
and SHAYNE HURNEY    )
    )
      Defendants.    )

## COMPLAINT

**COMES NOW**, the Plaintiffs LAUREN MOSS and ALEXANDRIA WHITE, as next of kin of Paul D. Moss, II, by and through their undersigned counsel, and for their Complaint at Law state as follows:

## INTRODUCTION

1.    Plaintiffs, Lauren Moss and Alexandria White, as next of kin of Paul D. Moss II, seek judgment against Defendants for violations of Mr. Moss' well established civil rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983; and Tennessee's wrongful death, negligence, assault, battery, and failure to intervene statutes, while acting under the color of law.

## JURISDICTION AND VENUE

2.    This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the Tennessee state law claims pursuant to 28 U.S.C. § 1367, because the Tennessee claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The federal law

1

claims are being brought under 42 U.S.C. § 1983. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

**PARTIES**

3.    Plaintiffs, Lauren Moss and Alexandria White, are and were at all times relevant, the natural daughters of the decedent Paul D. Moss II (DOB: 6/8/1970).

4.    Plaintiffs, Lauren Moss and Alexandria White, are the appropriate parties to bring this action for wrongful death pursuant to T.C.A §20-5-107.

5.    Defendant Anderson County, Tennessee ("Anderson County") is a political subdivision of the State of Tennessee, and provides law enforcement services through the Anderson County Sheriff's Office.

6.    Defendant Anderson County is responsible for the wrongful death of Mr. Moss, which was caused by the acts and/or failures to act of the duly appointed sheriff and deputies, of the Anderson County Sheriff's Office, who were acting under color of the law at the time, as well as the intentional and/or negligent acts and/or omissions of each and every other Defendant, who were employees and/or agents of Anderson County, and were acting within their scope of employment.

7.    Defendant City of Jellico, Tennessee ("Jellico") is a political subdivision of the State of Tennessee and, provides law enforcement services through the Jellico Police Department ("JPD).

8.    Defendant Jellico is a political subdivision of the State of Tennessee that is responsible for the wrongful death of Mr. Moss, which was caused by the intentional and/or negligent acts and/or failures to act of the duly appointed officers of the JPD, who were acting under color of law at the time, as well as the intentional and/or negligent acts and/or omissions of each and every other Defendant, who were employees and/or agents of Jellico, and were acting within their scope of employment.

9.    At all times material hereto, Defendant RUSSELL BARKER was a citizen

2

and resident of Anderson County, Tennessee, and was acting in his capacity as the elected Sheriff of Anderson County, employed by Defendant Anderson County, and was acting under the color of law. RUSSELL BARKER is sued in both his individual and official capacities. As Sheriff, RUSSELL BARKER was the policymaker with respect to operations, general orders, and treatment of suspects, arrestees, inmates, and detainees, and responsible for the daily operations of the Anderson County Sheriff's Office and formed and adopted its customs.

10.     At all times material hereto, Defendant Gary Perkins was a citizen and resident of Campbell County, Tennessee, and was acting in his capacity as the Chief of Police, employed by Defendant City of Jellico, and was acting under the color of law. Gary Perkins is sued in both his individual and official capacities. As Chief of Police, Gary Perkins was the policymaker with respect to operations, general orders, and treatment of suspects, arrestees, inmates, and detainees, and responsible for the daily operations of the Jellico Police Department and formed and adopted its customs.

11.     At all times material hereto, Defendant Denver Waddell was a citizen and resident of Anderson County, Tennessee, and was acting in his capacity as a Sergeant of the Anderson County Sheriff's Office Deputy and employed by Defendant Anderson County, and was acting under the color of law. He is sued in both his individual and official capacities.

12.     At all times material hereto, Defendant Christopher Conner was a citizen and resident of Anderson County, Tennessee, and was acting in his capacity as Corporal of the Anderson County Sheriff's Office, employed by Defendant Anderson County, and was acting under the color of law. He is sued in both his individual and official capacities.

13.     At all times material hereto, Defendant Whitney Davis was a citizen and

3

resident of Anderson County, Tennessee, and was acting in her capacity as a Deputy of the Anderson County Sheriff's Office Deputy and employed by Defendant Anderson County, and was acting under the color of law. She is sued in both her individual and official capacities.

14.     At all times material hereto, Defendant Shayne Hurney was a citizen and resident of Campbell County, Tennessee, and was acting in his capacity as a Police Officer of the Jellico Police Department, employed by Defendant City of Jellico, and was acting under the color of law. He is sued in both his individual and official capacities.

15.     Defendants Russell Barker, Denver Waddell, Christopher Conner, Whitney Davis and Anderson County will be collectively referred to as "County Defendants."

16.     At all times material herein, County Defendants were employed and/or acted as agents of Defendant Anderson County and acting under the color of law.

17.     Defendants Gary Perkins, Shayne Hurney, and the City of Jellico will be collectively referred to as "City Defendants."

18.     At all times material herein, City Defendants were employed and/or acted as agents of Defendant City of Jellico.

19.     Defendant Anderson County established and/or delegated to Defendant Barker and/or other employees the responsibility of establishing and implementing policies and customs of the ACSO regarding vehicle pursuits, the use of force, medical care, medical screenings, safety screenings, medical monitoring, and basic care of each suspect, arrestee, detainee, and inmate; and for implementing policies and customs for training other deputies and employees on the same.

20.     Defendant Jellico established and/or delegated to Defendant Perkins and/or other employees the responsibility of establishing and implementing policies and customs regarding vehicle pursuits, the use of force, and basic care of each suspect, arrestee,

4

detainee, and inmate; and for implementing policies and customs for training other officers on the same.

## FACTUAL BACKGROUND

### A. JPD's Policies and Procedures

### 1. JPD's Pursuit Policy

21.　　JPD's pursuit policy defines pursuit as "the attempted motorized apprehension of another vehicle at the point in which the officer reasonably suspects the vehicle to be apprehended is not going to stop."

22.　　JPD's pursuit policy defines high-speed pursuit as "a pursuit at speeds that exceed the legal speed limit."

23.　　JPD's pursuit policy provides that "[a]s a general rule, pursuit is not recommended or favored when the potential danger to the officer and the general public outweighs the potential advantage of apprehending a fleeing vehicle by such means."

24.　　That is to say "pursuit is clearly inappropriate when the pursuit endangers life more than the person being pursued endangers life."

25.　　JPD's pursuit policy further provides that "[a] decision not to pursue is the wiser choice when the person is known and poses no immediate threat to the community."

26.　　JPD's Pursuit Policy continues "[m]any factors have a bearing on an officer's choice. Some of the major ones are:

　　　　a.　　Alternative means of apprehension

　　　　b.　　Nature of offense

　　　　c.　　Road conditions

　　　　d.　　Traffic conditions

　　　　e.　　Time of day

　　　　f.　　Weather conditions

5

g.     Speed of pursuit

h.     Presence of pedestrians

i.     Nature of area through which pursuit is being attempted. "

27.     JPD's Pursuit Policy continues:

> "[t]he decision to pursue is NOT IRREVOCABLE, and it is the intelligent officer who knows when to discontinue the pursuit. The experience and common sense of each officer coupled with his concern for the safety of the public and himself should guide the officer in the decision. A decision not to pursue or to break off a pursuit will not subject the officer to any disciplinary actions."

### 2. JPD's High-Speed Pursuit Policy

28.     Under JPD's High-Speed Pursuit Procedure, a high-speed pursuit is only authorized when all three of the following conditions exist:

> 1. the officer has probable cause to believe the person about to be pursued has committed, or is going to commit a felony involving the use or threat of violence toward a person or persons; and
>
> 2. there are no safer alternative means of apprehension; and
>
> 3. traffic, road, and weather conditions permit the pursuit so that the danger to the public caused by the pursuit is less than the danger posed by the suspect.

29.     JPD'S High-Speed Pursuit Procedure continues that "[o]nce an officer attempts to apprehend a suspect by using a police vehicle and begins to exceed the speed limit (or otherwise not comply with posted or written traffic rules and regulations), the officer should ask himself" if he has "reasonable suspicion that the vehicle to be apprehended is not going to stop."

30.     JPD's High-Speed Pursuit Procedure states that if the officer does have reasonable suspicion that the vehicle to be apprehended will stop, then the office should continue with the stop. However, if the officer does not have such a reasonable suspicion,

6

then a decision as to whether to proceed should be based on further questions.

31.    If no such reasonable suspicion exists, the JPD's High-Speed Pursuit Procedure provides that officers should ask themselves "are there safer alternative means of apprehending the suspect." If yes, then the officer should terminate the pursuit.

32.    If there are not safer alternative means of apprehending the suspect, then the officer should ask himself "do I have probable cause to believe that an occupant of the vehicle has committed a felony or will commit a felony involving violence to a person." If no, then the officer should terminate pursuit. If yes, then the officer is to consider risk assessment criteria.

33.    However, the JPD's High-Speed Pursuit Procedure notes that "[o]nce one (or more) of the following has been determined, terminate the pursuit (unless there are circumstances which dictate that the public interest in apprehending the suspect outweighs the risk of injury from the pursuit): (a) recognition of the vehicle; (b) recognition of the driver and/or passenger(s); (c) identification of license plate number."

34.    The JPD's High-Speed Pursuit Procedure continues that "[u]pon commencing pursuit, the officer shall immediately activate emergency equipment, blue lights and siren, and make radio contact with the dispatcher and communicate the following information: 1) identity of officer's unit; 2) exact location and direction of travel; 3) description of pursued vehicle, make and model, color, and year if known; 4) tag number and state if known; and 5) number of occupants in pursued vehicle with sex, race, and approximate age if possible."

35.    JPD's High-Speed Pursuit Procedure continues "[t]he pursuing officer shall maintain contact with the dispatcher and keep the dispatcher and other units informed of the pursued vehicle's direction of travel."

36.    JPD's High-Speed Pursuit Procedure continues "[w]hen it is anticipated the

7

pursuit will enter another jurisdiction, the appropriate police agency will be notified with all pertinent information."

37. JPD's High-Speed Pursuit Procedure further states that "[p]rimary command responsibility shall rest with the department's commanding or supervisory officer on duty at the time, communicating through the dispatcher."

38. JPD's High-Speed Pursuit Procedure continues "[i]f a supervisor orders the officer to terminate pursuit, he will immediately do so, reporting to the dispatcher the location and direction of travel of the pursued vehicle at the time of termination."

39. JPD's High-Speed Pursuit Procedure continues "[t]he pursuing officer shall constantly weight the necessity of the pursuit, considering such factors as the safety of the public, conditions of the road, and so on."

40. JPD's High-Speed Pursuit Procedure continues "[i]f , at any time, [the officer] feels the pursuit is a greater threat to the public safety than the offender being pursued, he will terminate the pursuit and notify the dispatcher of his decision."

### 3. JPD's Firearms and Other Weapons Policy

41. JPD's Firearms and Other Weapons Policy provides that "[o]fficers shall attempt all reasonable means of apprehension and control within their command before resorting to the use of deadly force."

42. JPD's Firearms and Other Weapons Policy further provides that "[o]fficers shall not unnecessarily draw or display any firearms or other weapon."

43. Regarding carrying of firearms and ammunition, JPD's Firearms and Other Weapons Policy provides that "[c]artridges shall not be carried loose but shall be secured in clips, dump pouches, speed loaders, or magazines."

44. JPD's Firearms and Other Weapons Policy continues that "[f]irearms may be

8

discharged by an officer in the performance of a police duty: a) at department qualifications or firearms training; b) at an approved range; c) for test firing by the crime laboratory; d) to kill seriously injured or dangerous animals in an emergency; and f) when the use of deadly force is authorized."

45. JPD's Firearms and Other Weapons Policy provides the following prohibited uses of firearms: "a) as a warning; b) from a moving vehicle; c) at the occupant of a moving vehicle unless deadly force is being used against the officers by that vehicle's occupants; d) unless the officer, in his judgment, has a clear field of fire; e) unless the officer, in his judgment, reasonably believes that the suspect can be hit; and f) when danger to innocent bystanders and/or property is greater than the danger the suspect poses to them."

46. Regarding the use of batons, JPD's Firearms and Other Weapons Policy provides that "if circumstances do not warrant the use of deadly force, the baton may be used."

47. JPD's Firearms and Other Weapons Policy continues that batons may be used when "a) officers are defending themselves or others from bodily harm; b) to make an arrest when resistance is encountered and other reasonable means have failed; c) to subdue persons who have threatened bodily harm to themselves or others, if other means of control are impractical."

**4. JPD's Use of Force Policy**

48. JPD's Use of Force Policy provides that deadly force can be used to protect a life "whenever circumstances exist where the use of such force is the only reasonable alternative to protecting the life of the officer using such force or the life of another person."

49. JPD's Firearms and Other Weapons Policy continues that "deadly force to effect an arrest may be used only after the criteria are met as stipulated in T.C.A. 40-7-108."

50. JPD's Firearms and Other Weapons Policy continues "[d]eadly force is authorized to effect an arrest only if all other reasonable means of apprehension have been

9

exhausted and, where feasible, warning has been given the defendant by the officer identifying himself as an officer, or the officer gives an oral order to halt or an oral warning that force might be used."

51.     JPD's Firearms and Other Weapons Policy further provides that "[n]o form of deadly force shall be used that would pose a substantial risk to innocent bystanders, which is greater than the substantial risk to a person whose life is being defended if defense of others or self-defense is the reason for deadly force."

52.     JPD's Firearms and Other Weapons Policy continues "[t]he value of human life far outweighs the gravity of an offense that does not inflict, or threaten to inflict, serious bodily harm."

53.     JPD's Firearms and Other Weapons Policy continues "[c]onsequently, deadly force shall not be used to effect the arrest of a person who is to be charged with any misdemeanor offense, or any non-capital felony offense."

**B. JPD Refuses to Implement Department-Wide Audiovisual Recorders**

54.     For years, law enforcement agencies throughout the United States and Tennessee have been equipping law enforcement officers with audio and video recording devices in order to obtain more objective evidence about police-citizen encounters.

55.     Law enforcement agencies across the country utilize a wide variety of tools for this purpose, such as patrol car "dash" cams, body wire audio recorders, and body cameras.

56.     On information and belief, as of the filing of this complaint most law enforcement agencies in Tennessee have adopted at least vehicle dash cameras and audio recorders, if not body cameras.

57.     However, JPD has delayed the implementation of all such technologies for as long as possible.

10

58.     JPD has intentionally stalled the process of purchasing and implementing body and dash cameras as long as possible, with no department-wide implementation yet to occur as of the filing of this complaint.

### C. JPD Refuses to Provide Properly Functioning Equipment to Officers.

59.     For years, law enforcement agencies throughout the United States and Tennessee have been equipping law enforcement officers with properly working radios.

60.     Radio communications enable the communications command center, dispatch, to give directions to police patrol cars, motorcycles, helicopters, boats or to police stations.

61.     Radio communications are how Jellico Police Officers are to maintain contact with dispatch and their supervisor.

62.     Radio communications are how Jellico Police Officers receive instructions from their supervisors as to how and when to proceed and/or discontinue pursuit of a subject.

63.     Without properly working radio communications, Jellico Police officers cannot maintain contact with dispatch and their supervisors.

64.     The Jellico Police Department knew for months that it had issues with its radio communications systems yet did not fix the issue.

65.     The Jellico Police Department knew that the radio communications system in Officer Hurney's patrol vehicle was not functioning properly yet did not fix the issue.

66.     JPD intentionally stalled the process of fixing its radio communications systems.

### D. JPD Punishes Officers Who Critique JPD

67.     JPD's policies severely restrict officer speech, particularly in the online sphere, essentially prohibiting them from offering any criticism whatsoever of JPD's

11

leadership, policies, or practices.

68.    JPD enforces these speech-restriction policies with punitive discipline against officers who speak out against the administration, or who corroborate community concerns. Such punitive discipline can range from suspension to termination.

69.    JPD has in fact imposed punitive discipline on officers who spoke out against the JPD administration in favor of improving conditions for officers and the community as a whole.

### E. Jellico Police Officer Shayne Hurney

70.    On information and belief, JPD officer Shayne Hurney previously dated ACSO Deputy Whitney Davis for approximately three (3) years.

71.    On information and belief, as of April 14, 2022, Officer Hurney and Deputy Davis had been broken up for approximately six (6) weeks.

72.    On March 25, 2022, Shayne Hurney completed his Police Academy training and received a certificate of completion.

73.    During his time at the Police Academy, Officer Hurney lost two rounds of ammunition. At no time were the missing two rounds of ammunition ever replaced.

74.    As a result of losing two rounds of ammunition while at the Police Academy, Officer Hurney's department issued firearm did not have the requisite number of rounds in it.

75.    On or about March 28, 2022, Officer Shayne Hurney completed his first shift fresh out of the academy, under the supervision of then-Jellico Police Department Captain, Anthony Lay.

76.    On information and belief, the radio communications system in Officer Shayne Hurney's patrol vehicle had issues at the time he received the vehicle.

77.    On information and belief, JPD was aware of the issues with the radio

12

communications system in Officer Hurney's patrol vehicle.

78.     On information and belief, at least three JPD officers had notified JPD and Chief Perkins of the issues with the radio communications system in Officer Hurney's patrol vehicle and requested the system be fixed, yet were ignored.

79.     On information and belief, the officer who was assigned to Officer Hurney's patrol vehicle prior to him had notified JPD and Chief Perkins of the issues with the radio communications system in the patrol vehicle and requested the system be fixed, yet was ignored.

80.     On information and belief, Officer Hurney had notified JPD and Chief Perkins of the issues with the radio communications system in his patrol vehicle and requested the system be fixed yet was ignored.

81.     On information and belief, JPD Captain Anthony Lay had notified JPD and Chief Perkins of the issues with the radio communications system in Officer Hurney's patrol vehicle and requested the system be fixed yet was ignored

82.     Officer Hurney had been on the job less than three full weeks as of April 14, 2022.

83.     Officer Hurney lacked the experience necessary to adequately make a determination as to when to engage in a pursuit of a vehicle, particularly a high-speed pursuit, as well as when to discontinue such a pursuit.

84.     Officer Hurney did not receive any communications from JPD superiors to assist him during his pursuit of Mr. Moss after his radio communications experienced connecting issues.

## F. ACSO's Policies and Procedures

## 1. ACSO's Pursuit Policy

85. ACSO's Pursuit Policy defines a pursuit as "an active attempt by a member in an authorized emergency vehicle to apprehend one or more occupants of a moving motor vehicle, providing the driver of such vehicle is aware of the attempt and is avoiding apprehension by maintaining or increasing the speed, alluding the emergency vehicle, or by failing to stop."

86. ACSO's Pursuit Policy states pursuits may be "initiated when an individual who is suspected of a felony or serious misdemeanor offense, the nature of which makes the suspect's escape more dangerous to the community than the risks posed by the pursuit, clearly exhibits an intent to avoid arrest by using a vehicle to flee."

87. ACSO's Pursuit Policy further provides that the "major factors for consideration of initiating a pursuit and/or the termination of said pursuit include the following: a) safety of public and member(s); b) seriousness of the offense/violation and the danger the suspect poses to the community if not immediately apprehended; c) opportunity for delayed arrest of the violator; d) traffic density and conditions; e) exercising good judgment; f) weather and road conditions; g) presence of passengers; h) presence of pedestrians; i) degree of control suspect has over his vehicle; j) degree of danger the suspect poses through his pursuit driving practices; k) speed and duration of pursuit."

88. ACSO's Pursuit Policy continues "[m]embers intitiating a pursuit shall notify the Dispatcher via designated police radio frequency of the following: a) unti number; b) reason for pursuit; c) location and route of vehicle; d) complete description of vehicle; e) state and number of license plate; f) number and sex of occupants of vehicle."

14

89.     ACSO's Pursuit Policy continues "[m]embers shall maintain radio communications with the Dispatcher and inform the Dispatcher of the pursuit status. The pursuing member shall notify the Dispatcher when the pursuit is terminated."

90.     ACSO's Pursuit Policy states "[d]ispatch personnel must notify the pursuing member's supervisor of the pursuit as soon as possible and practical."

91.     ACSO's Pursuit Policy continues "[i]t is the field supervisor's responsibility to constantly and objectively monitor and evaluate the reasonableness of the pursit based on the aforementioned criteria." "The pursuit may be terminated at any time by a supervisor."

92.     ACSO's Pursuit Policy continues " [s]upervisors should recognize that they may be in the best position to objectively assess the reasonableness of a pursuit."

93.     ACSO's Pursuit Policy continues "[r]oadblocks and/or forcible stops will be established only to stop a violent felon or a suspect whose offense or violation poses an imminent danger to the community if not immediately apprehended."

94.     ACSO's Pursuit Policy further provides "[r]oadblocks and/or forcible stops should only be employed after all reasonable means of apprehension have been exhausted."

95.     ACSO's Pursuit Policy continues "[r]oadblocks and/or forcible stops will be established only when specifically authorized by a supervisor."

96.     ACSO's Pursuit Policy continues "members establishing roadblocks and/or forcible stops should have a definite plan for removing innocent motorists from the danger zone and instruct them accordingly."

97.     ACSO's Pursuit Policy further states "roadblocks and/or forcible stops are considered use of deadly force and must be reasonable."

98.     ACSO's Pursuit Policy continues "a field supervisor shall respond immediately to the termination point and assume responsibility for force action at the

15

scene."

99.    ACSO's Pursuit Policy requires that members and supervisors be "constantly reassessing the reasonableness and appropriateness of the pursuit to determine if it should be terminated."

100.    As it pertains to inter and intra jurisdictional pursuits, ACSO's Pursuit Policy provides that "a field supervisor may authorize assisting units to respond as emergency vehicles" in the event "an outside agency engaged in an active pursuit enters this county."

101.    ACSO's Pursuit Policy requires that outside agency will be "requested to provide the same information our primary unit is expected to provide."

102.    ACSO's Pursuit Policy further states that "members assisting outside agencies in pursuits will terminate their involvement when the pursuit leaves this jurisdiction unless further assistance is requested by the outside agency and authorized by a field supervisor."

103.    ACSO's Pursuit Policy continues "[i]n the event a pursuit leaves this jurisdiction, the field supervisor must ensure that the adjoining jurisdiction is notified, and that information relevant to the pursuit is provided to them."

104.    ACSO's Pursuit Policy continues "in cases involving a misdemeanor offense, members will terminate the pursuit when leaving this jurisdiction [which is] defined as the Anderson County line."

105.    ACSO's Pursuit Policy continues "in cases involving a felony offense, members may continue the pursuit, if radio contact can be maintained and continuous pursuit is authorized by the field supervisor."

### 2. ACSO's Deadly Force Policy

106.    ACSO's Deadly Force Policy provides the "use of deadly force is

16

authorized when a member reasonably believes that such force is necessary in order to stop an imminent threat of serious bodily harm or death against the member or another person."

107.    ACSO's Deadly Force Policy continues "a law enforcement officer may use or threaten to use force that is reasonably necessary to accomplish the arrest of an individual suspected of a criminal act who resists or flees from the arrest."

108.    ACSO's Deadly Force Policy further provides "a law enforcement officer may use deadly force to affect an arrest only if all other reasonable means of apprehension have been exhausted or are unavailable, and where feasible, the officer has given notice of the officer's identity as such and given a warning that deadly force may be used unless resistance or flight ceases and (1) the officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or (2) the officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended."

109.    ACSO's Deadly Force Policy provides that "shooting at or from moving vehicles" is prohibited "unless they reasonably believe deadly force is necessary to defend the member or a third person from the use or imminent use of deadly force."

### G. ACSO Refuses to Implement Department-Wide Audiovisual Recorders

110.    For years, law enforcement agencies throughout the United States and Tennessee have been equipping law enforcement officers with audio and video recording devices in order to obtain more objective evidence about police-citizen encounters.

111.    Law enforcement agencies across the country utilize a wide variety of tools for this purpose, such as patrol car "dash" cams, body wire audio recorders, and body cameras.

112.    On information and belief, as of the filing of this complaint most law

enforcement agencies in Tennessee have adopted at least vehicle dash cameras and audio recorders, if not body cameras.

113.    However, ACSO has only implemented dash cameras without audio.

114.    The dash cameras in the patrol vehicles of ACSO Deputies Waddell and Conner did not have audio recording capabilities.

115.    ASCO has delayed the implementation of dash cameras with audio and body cameras for as long as possible.

116.    ACSO has intentionally stalled the process of purchasing and implementing body cameras and  dash cameras with audio for as long as possible, with no department-wide implementation yet to occur  as of the filing of this complaint.

### H. ACSO Deputy Sergeant Denver Waddell

117.    ACSO Deputy Sgt. Denver Waddell has been with ACSO since February of 2004.

118.    Sgt. Waddell started his career in the jail before going to the Academy in 2008 and then joining ACSO patrol upon completing the Academy.

119.    Sgt. Waddell was promoted to Corporal in 2011 and then promoted to Sergeant in December of 2018.

120.    Sgt. Waddell was the field supervisor of the night in question for Deputies Conner and Davis.

### I. ACSO Deputy Corporal Christopher Conner

121.    ACSO Deputy Cpl. Christopher Conner began his law enforcement career in 1998 with the La Fourche Parish Sheriff's Office.

122.    Cpl. Conner joined ACSO in 2005.

123.    Cpl. Conner was promoted to the rank of Corporal approximately two and a

18

half years later.

124.     Cpl. Conner noted that his in-car video camera was malfunctioning the Sunday prior to the shooting incident.

125.     Cpl. Conner has stated he is unaware if his camera was functioning properly during his pursuit and shooting of Paul D. Moss, II.

### I. ACSO Deputy Whitney Davis

126.     On information and belief, ACSO Deputy Whitney Davis previously dated JPD Officer Shayne Hurney for approximately three (3) years.

127.     On information and belief, as of April 14, 2022, Officer Hurney and Deputy Davis had been broken up for approximately six (6) weeks.

128.     ACSO Deputy Whitney Davis began as a reserve Deputy in Anderson County in 2017.

129.     After two years, Deputy Davis began working in the jail for two years before going to the academy.

130.     Deputy Davis graduated from the academy in November of 2021.

### J. The Pursuit of Paul D. Moss

131.     On April 14, 2023, at approximately 11:05 p.m., Paul D. Moss, II was the driver of a certain 2022 blue Kia Forte driving southbound on I-75 in Williamsburg, Whitley County Kentucky.

132.     On the above date and time, Whitley County Dispatch received two calls from  concerned citizens regarding a blue car matching Mr. Moss's that was "all over the interstate" and was switching its headlights on and off.

133.     At approximately 11:06 p.m. officers were dispatched.

134.     At the same time officers were dispatched, Whitley County Dispatch

19

received a third call regarding Mr. Moss's vehicle and driving.

135.    At approximately 11:07 p.m. Williamsburg (KY) Police Department (WPD) officers arrived on the scene and began pursuing Mr. Moss down I-75, approximately half a mile past mile marker 11.

136.     During WPD's pursuit, WPD officers contacted Whitley County Dispatch who then contacted WPD Chief Wayne Bird who supervised the pursuit.

137.    Chief Bird instructed WPD officers that one unit could continue into Tennessee until a Tennessee unit was able to take the lead on the pursuit, at which time WPD was to discontinue all pursuit.

138.    During WPD's pursuit of Mr. Moss's vehicle, Officer Shayne Hurney of the Jellico Police Department received a call from dispatch informing him that WPD was in pursuit of a blue vehicle and it was coming down the interstate. Officer Hurney proceeded to the interstate and positioned his vehicle in the median next to a concrete barrier in order to deploy his spike strips on the target vehicle.

139.    When the spike strips failed, Officer Hurney returned to his vehicle and joined the pursuit.

140.    WPD radioed to Officer Hurney requesting that he take over the pursuit since it had crossed into Tennessee from Kentucky, which Officer Hurney agreed to do. WPD then disengaged from pursuit of Mr. Moss's vehicle.

141.    At the 152 mile marker Officer Hurney lost contact with dispatch.

142.    Upon losing contact with dispatch, Officer Hurney then called dispatch using his cell phone.

143.    Officer Hurney then switched his radio to Campbell County dispatch and advised them of the situation. Then Officer Hurney called his ex-girlfriend who is an Anderson County Deputy, Deputy Whitney Davis, and was giving her up-to-date

20

information on what was happening in the pursuit. The phone call to Deputy Whitney Davis started at 23:30 and lasted nine minutes and twenty-nine seconds.

144.    Dispatch notified the Anderson County Sheriff's Office of the pursuit involving Mr. Moss's vehicle that was headed down the interstate toward Anderson County.

145.    Sgt. Waddell told Deputy Conner and Deputy Davis to stay on the 122 exit ramp in case the pursuit exited the interstate there.

146.    Sgt. Waddell went down to the bottom of the on-ramp at I-75 Exit 122 southbound while Deputy Conner waited at the top of the ramp in case Mr. Moss's vehicle exited the 122 Exit.

147.    As Mr. Moss's vehicle approached Sgt. Waddell's location, Sgt. Waddell deployed spike strips which hit the right rear of Mr. Moss's vehicle.

148.    After the deployment of spike strips, Deputy Conner got on I-75 southbound with his lights and siren activated and joined the pursuit of Mr. Moss. Sgt. Waddell and Deputy Whitney Davis joined in on the pursuit following him.

149.    The Anderson County Deputies reached excessive speeds to catch up to JPD officer Hurney and Mr. Moss.

150.    As the Anderson County Sheriff's Deputies approached the Knox County line, Sgt. Waddell radioed Conner and Davis to discontinue the pursuit at the Knox County line.

151.    Upon such instruction, Conner turned his lights off and got into the right hand land to return to Anderson County.

152.    At around mile marker 116.6 on I-75 south, Mr. Moss lost control of his vehicle and crashed into the median barrier thereby causing his vehicle to face in the opposite direction of traffic.

21

153. The right rear tire of Mr. Moss's vehicle was essentially destroyed by the spike strips and the wreck. Mr. Moss's vehicle effectively only had three working tires at that point.

154. Deputy Davis, while on the phone with Officer Hurney, radioed to Conner and Sgt. Waddell informing them that Mr. Moss's vehicle had spun out just past the Knox County line. Deputy Conner was able to see Officer Hurney's emergency lights on his patrol vehicle activated and continued toward the scene rather than discontinuing the pursuit.

155. Sgt. Waddell decided that he and the other Anderson County deputies would go to the scene and assist the Jellico unit, Officer Hurney.

### K. JPD Officer Hurney and ACSO Sgt. Waddell and Cpl. Conner Killed Mr. Moss

156. Following the wreck, Officer Hurney exited his patrol vehicle and, with his service gun drawn, approached Mr. Moss's vehicle. Upon Mr. Moss not exiting his vehicle fast enough, Officer Hurney drew his service baton and began to smash in Mr. Moss's vehicle windows in an attempt to gain entry to Mr. Moss's vehicle.

157. After Officer Hurney broke Mr. Moss's windows, he grabbed the car door and the inside handle and opened the door. Officer Hurney and Mr. Moss both grabbed for the door. Officer Hurney again opened the door, this time standing in the door frame so as to prevent Mr. Moss from shutting the door.

158. Officer Hurney instructed Mr. Moss to get out of the car and get on the ground to which Mr. Moss begged for Officer to "fucking kill me, fucking kill me, fucking kill me."

159. Rather than appreciate the clear mental health crisis that Mr. Moss was experiencing, Officer Hurney delivered baton strikes to Mr. Moss's leg and left body area.

22

160. ACSO deputies Waddell, Conner, and Davis all drew their service firearms upon arriving on the scene.

161. ACSO Sgt. Waddell initially drew his rifle upon arriving at the scene, but placed it back in his patrol vehicle and drew his service handgun.

162. At this time, Officer Hurney drew his weapon.

163. At no point in time did Mr. Moss attempt to harm any officers, deputies, or any other persons.

164. Mr. Moss did not attempt to run over any officers, deputies, or any other persons.

165. Despite Mr. Moss's vehicle having only three operative wheels, Officer Hurney, and Anderson County Deputies Conner and Waddell began firing at Mr. Moss.

166. Officer Hurney was behind Mr. Moss's vehicle when he began firing.

167. ACSO deputies Waddell, Conner, and Davis were positioned in front of, but off to the side of, Mr. Moss's vehicle.

168. Defendants Hurney, Waddell, Conner, and Davis were not facing any harm or threat of harm from Mr. Moss, nor was anyone else.

169. Deputy Davis did not fire at Mr. Moss.

170. Deputy Davis witnessed the shooting of Mr. Moss.

171. Deputy Davis had the opportunity and means to prevent harm to Mr. Moss, yet did not do so.

172. Deputy Davis, did not attempt to stop her fellow law enforcement officers from firing upon Mr. Moss.

173. Officer Hurney, and Anderson County Deputies Conner and Waddell unleashed thirty-two (32) total shots at Mr. Moss in a matter of seconds.

23

174.     Twenty-seven (27) of the thirty-two (32) rounds fired struck Mr. Moss's vehicle.

175.     Mr. Moss was struck nine (9) times by the various rounds fired by Jellico Police Officer Hurney and Anderson County Sheriff Deputies Waddell and Conner.

176.     Mr. Moss sustained a fatal gunshot wound to his left chest with injuries to his left lung and abundant blood within the left chest cavity. He also sustained a gunshot wound to the back of the neck with injuries to the spine, and a gunshot wound of the left side of the neck with fracture of the mandible.

177.     The direction of travel for all the projectiles was either from back-to-front or from left-to-right. Five of the projectiles entered into various regions of Paul Moss's back, two entered the midline, one was in the left shoulder, and one in the lower back.

178.     Anderson County Sheriff Deputy Conner's issued firearm is a Glock Model 22, .40 Caliber.

179.     Anderson County Sheriff Deputy Waddell's issued firearm is a Glock Model 22, .40 Caliber.

180.     Jellico Police Officer Hurney's issued firearm is a Glock Model 17, Caliber-9MM.

181.     Sixteen (16) of the rounds fired were from a .40 Caliber gun. Sixteen (16) of the rounds fired were from a 9MM Caliber gun.

182.     Mr. Moss was transported to the hospital where he was pronounced dead at approximately 12:35 a.m. on April 15, 2022.

### L. JPD Justifies the Killing of Mr. Moss

183.     Immediately after the shooting, the PBA dispatched an  attorney to represent Hurney at the scene of the homicide.

184.     Officer Hurney spoke with the PBA attorney, and then declined the TBI

24

agents' request to provide a statement to the TBI on the night of the shooting.

185.    Hurney delayed his TBI interview a couple of days, and used the delay to consult with his PBA attorney.

186.    After preparing with his PBA attorney, Hurney agreed to speak to the TBI.

187.    When Hurney spoke with the TBI agents, Hurney claimed that Mr. Moss had attempted to run over ACSO deputies and that he, Hurney, used deadly force to prevent harm to others.

188.    The surveillance footage did not depict Mr. Moss attempting to run over Officer Hurney, Sgt. Waddell, Cpl. Conner, Deputy Davis, or anyone else.

## M. ACSO Justifies the Killing of Mr. Moss

189.    Immediately after the shooting, the PBA dispatched attorneys to represent Sgt. Waddell, Cpl. Conner, and Deputy Davis at the scene of the killing.

190.    Sgt. Waddell, Cpl. Conner, and Deputy Davis all spoke with their PBA attorneys, and then declined the TBI agents' request to provide a statement to the TBI on the night of the shooting.

191.    Sgt. Waddell, Cpl. Conner, and Deputy Davis all delayed their TBI interviews a couple of days, and used the delay to consult with their PBA attorneys.

192.    After preparing with their PBA attorneys, Sgt. Waddell and Cpl. Conner agreed to speak to the TBI.

193.    When Sgt. Waddell spoke with the TBI agents, he claimed that Mr. Moss had driven his vehicle toward him and attempted to run him over, and that is why he used deadly force, to prevent harm to himself.

194.    When Cpl. Conner spoke with the TBI agents, he claimed that Mr. Moss had driven his vehicle toward Sgt. Waddell and attempted to run him over, and that is why he used deadly force, to prevent harm to Sgt. Waddell.

25

195.    When Deputy Davis spoke with the TBI agents, she claimed Mr. Moss accelerated towards the ACSO deputies and that is why they fired.

196.    The surveillance footage did not depict Mr. Moss attempting to run over Officer Hurney, Sgt. Waddell, Cpl. Conner, Deputy Davis, or anyone else.

## CLAIMS FOR RELIEF AGAINST CITY DEFENDANTS

## COUNT I: Excessive Force in Violation of the
## Fourth Amendment (42 U.S.C. § 1983)

197.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

198.    On April 14, 2022, Defendant Officer Hurney used unreasonable force against Mr. Moss by shooting at him sixteen (16) times and killing him.

199.    Mr. Moss did not pose a threat of imminent harm to Officer Hurney or a third party when he was shot and killed.

200.    Officer Hurney was acting under color of state law when he shot and killed Mr. Moss.

201.    Defendants Jellico and Perkins caused Hurney to kill Mr. Moss by:

  a.    Dismissing the complaints and concerns of officers regarding the unsafe working conditions present in the department; particularly the non-properly working radio communication systems

  b.    Intentionally delaying the implementation of body and dash cameras as long as possible, in order to prevent the existence of objective evidence regarding police-citizen encounters;

  c.    Failing to provide proper assistance to an officer – particularly an inexperienced officer – while in a high-speed pursuit;

  d.    Failing to maintain contact with an officer – particularly an

26

inexperienced officer – while involved in a high-speed pursuit across jurisdictional lines;

    e.    Failing to properly train officers to be able to ascertain when to terminate a pursuit;

    f.    Failing to properly train officers to be able to ascertain when to use force.

202.    Defendant Hurney acted intentionally and with reckless and disregard for Mr. Moss's rights by gunning him down for having fled.

203.    Mr. Moss suffered physical, legal, emotional, constitutional, and financial harm by being gunned down and left to die in the middle of I-75.

## COUNT II: Race Discrimination in Violation of the

## Fourteenth Amendment (42 U.S.C. § 1983)

204.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

205.    On April 14, 2022, Defendant Hurney used unreasonable force against Mr. Moss by shooting and killing him.

206.    Hurney was acting under color of state law when he killed Mr. Moss.

207.    Mr. Moss did not pose an objective threat of imminent harm to Hurney or a third party when Hurney killed him.

208.    Hurney viewed Mr. Moss as a greater threat to Hurney's safety because Mr. Moss was black.

209.    Hurney viewed Mr. Moss's life as less valuable because Mr. Moss was black.

210.    Hurney's shooting of Mr. Moss was motivated at least in part on account of Mr. Moss's race.

211.    Upon information and belief, JPD has a culture of stopping minorities more than their white counterparts – particularly black drivers.

212.    Upon information and belief, JPD has a culture of arresting minorities more than their white counterparts – particularly black drivers.

213.    Upon information and belief, JPD has a culture of training officers to target minorities more than their white counterparts – particularly black individuals.

214.    Defendant Hurney acted intentionally and with reckless and disregard for Mr. Moss's rights by gunning him down for running away.

215.    Mr. Moss suffered physical, emotional, legal, Constitutional, and financial harms by being gunned down, left to die in the grass, and killed.

## COUNT III: Wrongful Death

### (Tennessee Tort Law)

216.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

217.    On April 14, 2022, Defendant Hurney intentionally killed Mr. Moss for running away from him.

218.    Mr. Moss did not pose an objective threat of imminent harm to Hurney or a third party when Hurney killed him.

219.    Hurney did not have a legal justification for gunning Mr. Moss down.

220.    Mr. Moss suffered physical, legal, emotional, and financial harm by being gunned down, left to die in the middle of the road on I-75.

221.    Mr. Moss's beneficiaries at law suffered a loss of consortium due to Mr. Moss's death.

## COUNT IV

### (State Law Claim) Negligence

222.     Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

223.     City of Jellico, through its officer, owes a duty of care to residents of the City of Jellico and citizens of the United States, including Mr. Moss, to not cause unnecessary foreseeable harm in the course of law enforcement interactions, including the use of excessive force.

224.     The Defendant law enforcement officers, acting as agents of the City of Jellico, breached that duty of care by engaging in a course of conduct that unreasonably escalated the encounter to the use of deadly force.

225.     City of Jellico breached its duty of care to prevent foreseeable harm to Mr. Moss.

226.     This breach proximately caused Mr. Moss's severe injuries and death.

227.     City of Jellico is liable to the Estate of Mr. Moss for the negligent actions of its officer, which proximately caused him injury and death.

228.     The City of Jellico is liable to Plaintiffs for the negligent actions of its officer, which proximately caused injury to Mr. Moss.

229.     During the course of the chase and shooting, Mr. Moss experienced unthinkable pain, suffering, and fear for the imminent loss of his life.

230.     By virtue of the facts set forth above, the City of Jellico and Defendant Officer Hurney, are liable to Mr. Moss and his survivors for compensatory damages for negligently causing the death of Mr. Moss.

29

## COUNT V

## (Assault and Battery) (All individual Defendants)

231. Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

232. All individual Defendants pointed a firearm at Mr. Moss and unjustifiably used deadly force against Mr. Moss, such force was objectively excessive and unreasonable under the circumstances.

233. All individual Defendants' intentional acts as described more fully hereinabove, put Mr. Moss in actual, subjective apprehension of immediate harmful or offensive contact.

234. Mr. Moss's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

235. All individual Defendants' actions against Mr. Moss were unreasonable and unlawful. At the time Mr. Moss was shot by the individual Defendants, Mr. Moss did not pose any threat or harm to any members of the ACSO, JPD, or others. All individual Defendants acted with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of Mr. Moss, and was undertaken in bad faith and with actual malice.

236. As a further direct and proximate result of the conduct described above, Mr. Moss died. Prior to his death Mr. Moss suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care. Mr. Moss did not consent to contact with, from or by any of the individual Defendants.

237.    All individual Defendants are jointly and severally liable for their assault and battery towards Mr. Moss.

**COUNT VI:**
**Violation of Civil Rights Pursuant to Title 42 U.S.C.**
**§1983 (Municipal Liability)**

238.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

239.    Upon information and belief, Defendant Perkins as Chief is the highest-ranking official, had direct management supervision over JPD officers, including Officer Hurney, and was responsible for setting and implementing policy with respect to the JPD. In the alternative, Defendant Hurney was inadequately trained and supervised by Defendant Perkins and the City of Jellico.

240.    Defendant Jellico via Defendant Perkins failed to train and supervise JPD officers, including Defendant Hurney, and failed to supervise in a manner which deprived Mr. Moss of his constitutional rights.

241.    The unconstitutional actions and/or omissions of all individual Defendants, were pursuant to the following customs, policies, practices, and/or procedures of Jellico Police Department which were directed, encouraged, allowed, and/or ratified by policy making Defendant Chief Perkins.

242.    To the extent these policies are adequate, City Defendants failed to follow their own policies, in that:

     a.    They failed to engage in proper High-Speed pursuit procedures;

     b.    They failed to maintain contact between Officer Hurney and his supervisor during Officer Hurney's High-Speed Pursuit of Mr. Moss;

     c.    They failed to maintain a properly working radio communication system in Officer Hurney's patrol vehicle;

31

d. They failed to terminate the High-Speed Pursuit of Mr. Moss once the pursuit became too dangerous and there were other means to identify Mr. Moss by;

e. They failed to terminate the High-Speed Pursuit of Mr. Moss despite having no reason to believe Mr. Moss committed or would commit a felony involving violence to a person;

f. They failed to ensure primary command responsibility rested with the department's commanding or supervisory officer on duty at the time, communicating through the dispatcher, while Officer Hurney was in pursuit of Mr. Moss;

g. They failed to ensure Officer Hurney properly carried ammunition for his issued firearm;

h. They failed to ensure Officer Hurney did not use deadly force without justification to protect life;

i. They failed to ensure Officer Hurney did not use deadly force without justification to effect an arrest;

j. They failed to ensure Officer Hurney had probable cause to believe Mr. Moss had committed a felony involving the infliction or threatened infliction of serious bodily injury;

k. They failed to ensure Officer Hurney had probable cause to believe Mr. Moss posed a threat of serious bodily injury to Officer Hurney or others unless immediately apprehended;

l. And in other ways which will be discovered during this litigation.

243. At the time of the above-described series of events it was the custom or policy of Defendant Jellico to inadequately supervise, train, and provide with properly working equipment its officers, thereby evidencing a deliberate indifference to Mr. Moss'

32

constitutional rights.

244. The need for p r o p e r l y  training and equipping JPD officers with properly functioning equipment is obvious, and the lack of training, and providing of sufficient equipment was so inadequate that it was likely to result in violating the rights of individuals, including Mr. Moss.

245. Defendant Jellico's failure to supervise and provide J P D  o f f i c e r s  w i t h  p r o p e r l y  w o r k i n g  e q u i p m e n t  constituted a tacit authorization of the offensive acts.

## CLAIMS FOR RELIEF AGAINST COUNTY DEFENDANTS

## COUNT I: Excessive Force in Violation of the Fourth Amendment

## (42 U.S.C. § 1983)

246. Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

247. On April 14, 2022, Defendant Sgt. Waddell and Defendant Cpl. Conner used unreasonable force against Mr. Moss by shooting him a combined sixteen (16) times and killing him.

248. Mr. Moss did not pose an objective threat of imminent harm to Sgt. Waddell, Cpl. Conner or a third party when they shot and killed Mr. Moss.

249. Sgt. Waddell and Cpl. Conner were both acting under color of state law when they shot and killed Mr. Moss.

250. Defendant Anderson County and Defendant Barker caused Sgt. Waddell and Cpl. Conner to kill Mr. Moss by:

> a.  Intentionally delaying the implementation of body and dash cameras as long as possible, in order to prevent the existence of objective evidence regarding police-citizen encounters;

33

        b.      Failing to properly train officers to be able to ascertain when to terminate a pursuit;

        c.      Failing to properly train officers to be able to ascertain when to use force.

251.    At the time of the complained of events, Mr. Moss had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force.

252.    Any reasonable police officer and/or Sheriff's officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

253.    Mr. Moss also had the clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement on the basis of the Fourth and Fourteenth Amendments.

254.    All individual Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated the Fourth and Fourteenth Amendments on account of Mr. Moss's race.

255.    All individual Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Mr. Moss's federally protected rights. The force used by all individual Defendants shocks the conscience and violated the Fourth Amendment rights of Mr. Moss.

256.    All individual Defendants unlawfully seized Mr. Moss by means of objectively unreasonable, excessive and conscious shocking physical force. The force used was deadly force and did cause the death of Mr. Moss.

257.    The acts or omissions of all individual Defendants were the moving forces behind Mr. Moss' injuries. The acts or omissions of all individual Defendants as described

34

herein intentionally and/or negligently deprived Mr. Moss of his constitutional rights and caused him other damages. All individual Defendants are not entitled to qualified immunity for his actions.

258. On April 14, 2022, Defendant Sgt. Waddell and Defendant Cpl. Conner both used unreasonable force against Mr. Moss by shooting and killing him.

259. Defendant Sgt. Waddell and Defendant Cpl. Conner were acting under color of state law when they killed Mr. Moss.

260. Mr. Moss did not pose an objective threat of imminent harm to Sgt. Waddell, Cpl. Conner, or a third party when they killed him.

261. Defendant Sgt. Waddell and Defendant Cpl. Conner acted intentionally and/or negligently and/or with reckless disregard for Mr. Moss's rights by gunning him down for fleeing.

262. Mr. Moss suffered physical, legal, emotional, constitutional, and financial harm by being gunned down and left to die in the middle of I-75.

263. On information and belief, Mr. Moss suffered lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his injuries, in amounts to be ascertained in trial. Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

264. In addition to compensatory, economic, consequential and special damages, Plaintiff are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Moss. All Defendants are jointly and severally liable for violating Moss's Fourth Amendment Rights.

## COUNT II: Race Discrimination in Violation of the
## Fourteenth Amendment (42 U.S.C. § 1983)

265.     Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

266.     On April 14, 2022, Defendant Sgt. Waddell and Defendant Cpl. Conner both used unreasonable force against Mr. Moss by shooting and killing him.

267.     Defendant Sgt. Waddell and Defendant Cpl. Conner were acting under color of law when they killed Mr. Moss.

268.     Mr. Moss did not pose an objective threat of imminent harm to Sgt. Waddell, Cpl. Conner, or a third party when they killed him.

269.     Defendant Sgt. Waddell and Defendant Cpl. Conner viewed Mr. Moss as a greater threat to their safety because Mr. Moss was black.

270.     Defendant Sgt. Waddell and Defendant Cpl. Conner viewed Mr. Moss's life as less valuable because Mr. Moss was black.

271.     Defendant Sgt. Waddell and Defendant Cpl. Conner's shooting of Mr. Moss was motivated at least in part on account of Mr. Moss's race.

272.     Defendant Sgt. Waddell and Defendant Cpl. Conner acted intentionally and/or with reckless disregard for Mr. Moss's rights by gunning him down for fleeing.

273.     Mr. Moss suffered physical, emotional, legal, Constitutional, and financial harms by being gunned down, left in the middle of I-75.

274.     All individual Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated the Fourth and Fourteenth Amendments on account of Mr. Moss's race.

275.     All individual Defendants' actions and use of force, as described herein,

36

were also malicious and/or involved reckless, callous, and deliberate indifference to Mr. Moss's federally protected rights. The force used by all individual Defendants shocks the conscience and violated the Fourteenth Amendment rights of Mr. Moss.

276.     The acts or omissions of all individual Defendants were the moving forces behind Mr. Moss' injuries. The acts or omissions of all individual Defendants as described herein intentionally deprived Mr. Moss of his constitutional rights and caused him other damages. All individual Defendants are not entitled to qualified immunity for his actions.

277.     Defendant Sgt. Waddell and Defendant Cpl. Conner's shooting of Mr. Moss was motivated at least in part on account of  Mr. Moss's race in violation of the Fourteenth Amendment.

278.     Upon information and belief, ACSO has a culture of stopping minorities more than their white counterparts – particularly black drivers.

279.     Upon information and belief, ACSO has a culture of arresting minorities more than their white counterparts – particularly black drivers.

280.     Upon information and belief, ACSO has a culture of training deputies to target minorities more than their white counterparts – particularly black individuals.

281.     Defendants Waddell and Conner acted intentionally and with reckless disregard for Mr.  Moss's rights by gunning him down for fleeing.

282.     On information and belief, Mr. Moss suffered lost future earnings and impaired earnings capacities from the not yet fully ascertained sequelae of his injuries, in amounts to be ascertained in trial. Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

283.     In addition to compensatory, economic, consequential and special damages, Plaintiff are entitled to punitive damages against each of the individually named

Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Moss. All Defendants are jointly and severally liable for violating Moss's Fourteenth Amendment Rights.

## COUNT III: Wrongful Death

### (Tennessee Tort Law)

284.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

285.    On April 14, 2022, Defendant Sgt. Waddell and Defendant Cpl. Conner intentionally killed Mr. Moss for fleeing from him.

286.    Mr. Moss did not pose an objective threat of imminent harm to Defendant Sgt. Waddell, Defendant Cpl. Conner or a third party when they killed him.

287.    Defendant Sgt. Waddell and Defendant Cpl. Conner did not have a legal justification for gunning Mr. Moss down.

288.    Mr. Moss suffered physical, legal, emotional, and financial harm by being gunned down, left to die in the middle of the road on I-75, and killed.

289.    Mr. Moss's beneficiaries at law suffered a loss of consortium due to Mr. Moss's death.

## COUNT IV

### (Failure to Intervene)

290.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

291.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, Defendant Deputy Davis had the opportunity to intervene to prevent the violation of Mr. Moss's constitutional rights, but

38

failed to do so.

292.     As a direct and proximate result of the Defendant Davis's failure to intervene to prevent the violation of Mr. Moss's constitutional rights, Mr. Moss suffered injuries, including, but not limited to, physical harm, emotional distress, and death. Defendant Davis had a reasonable opportunity to prevent this harm, but failed to do so.

293.     The misconduct described in this Complaint was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. Moss's clearly established constitutional rights.

294.     Defendant Davis and Defendant Anderson County are liable for depriving Mr. Moss of his life, liberty and property and for punitive damage, compensatory damages, and reasonable attorneys' fees and costs.

## COUNT V

## (State Law Claim) Negligence

295.     Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

296.     Anderson County, through its Sheriff's deputies, owes a duty of care to residents of the Anderson County and citizens of the United States, including Mr. Moss, to not cause unnecessary foreseeable harm in the course of law enforcement interactions, including the use of excessive force.

297.     The Defendant law enforcement officers, acting as agents of the Anderson County, breached that duty of care by engaging in a course of conduct that unreasonably escalated the encounter to the use of deadly force.

298.     Anderson County breached its duty of care to prevent foreseeable harm to Mr. Moss.

299.     This breach proximately caused Mr. Moss's severe injuries and death.

300.     Anderson County is liable to the Estate of Mr. Moss for the negligent actions of its deputies, which proximately caused him injury and death.

301.     Anderson County is liable to Plaintiffs for the negligent actions of its deputies, which proximately caused injury to Mr. Moss.

302.     During the course of the chase and shooting, Mr. Moss experienced unthinkable pain, suffering, and fear for the imminent loss of his life.

303.     By virtue of the facts set forth above, Anderson County Deputy Defendant Waddell, Anderson County Deputy Defendant Conner, and Anderson County are liable to Mr. Moss and his survivors for compensatory damages for negligently causing the death of Mr. Moss.

## COUNT VI

### (Assault and Battery) (All individual Defendants)

304.     Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

305.     All individual Defendants pointed a firearm at Mr. Moss and unjustifiably used deadly force against Mr. Moss, such force was objectively excessive and unreasonable under the circumstances.

306.     All individual Defendants' intentional acts as described more fully hereinabove, put Mr. Moss in actual, subjective apprehension of immediate harmful or offensive contact.

307.     Mr. Moss's apprehension was objectively reasonable under the circumstances in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

308.     All individual Defendants' actions against Mr. Moss were unreasonable and unlawful. At the time Mr. Moss was shot by the individual Defendants, Mr. Moss did not

40

pose any threat or harm to any members of the ACSO, JPD, or others. All individual Defendants acted with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of Mr. Moss, and was undertaken in bad faith and with actual malice.

309.    As a further direct and proximate result of the conduct described above, Mr. Moss died. Prior to his death Mr. Moss suffered loss of his liberty and freedom, bodily injury resulting in pain and suffering, mental anguish, and medical expenses for treatment and care. Mr. Moss did not consent to contact with, from or by any of the individual Defendants.

310.    All individual Defendants are jointly and severally liable for their assault and battery towards Mr. Moss.

## COUNT VII:
## Violation of Civil Rights Pursuant to Title 42 U.S.C.
## §1983 (Municipal Liability)

311.    Plaintiffs incorporate by reference all paragraphs within this Complaint as though they had been fully set forth herein.

312.    Upon information and belief, Defendant Barker as Sheriff is the highest-ranking official, had direct management supervision over ASCO deputies, including Defendant Sgt. Waddell and Defendant Cpl. Conner, and was responsible for setting and implementing policy with respect to the ASCO. In the alternative, Defendant Sgt. Waddell and Defendant Cpl. Conner were inadequately trained and supervised by Defendant Barker and Anderson County.

313.    Defendant Anderson County via Defendant Barker failed to train and supervise ASCO deputies, including Defendant Sgt. Waddell and Defendant Cpl. Conner, and failed to supervise in a manner which deprived Mr. Moss of his constitutional rights.

314.    The unconstitutional actions and/or omissions of all individual Defendants, were pursuant to the following customs, policies, practices, and/or procedures of Anderson

41

County Sheriff's Department, which were directed, encouraged, allowed, and/or ratified by policy making Defendants Sheriff Barker and Defendant Sgt. Waddell and Defendant Cpl. Conner.

315. To the extent these policies are found to be adequate, County Defendants failed to follow their own policies, in that:

a. They failed to engage in proper pursuit procedures;

b. They failed to terminate the Pursuit of Mr. Moss once the pursuit became too dangerous and there were other means to identify Mr. Moss by;

c. They failed to terminate the Pursuit of Mr. Moss despite having no reason to believe Mr. Moss committed or would commit a felony involving violence to a person;

d. They failed to terminate pursuit of Mr. Moss once the pursuit exited Anderson County's jurisdictional line;

e. They failed to ensure Defendant Sgt. Waddell and Defendant Cpl. Conner did not fire at a moving vehicle thereby creating a greater risk or danger to innocent bystanders and/or property on I-75;

f. They failed to ensure Defendant Sgt. Waddell and Defendant Cpl. Conner did not use deadly force without justification to protect life;

g. They failed to ensure Defendant Sgt. Waddell and Defendant Cpl. Conner did not use deadly force without justification to effect an arrest;

h. They failed to ensure Defendant Sgt. Waddell and Defendant Cpl. Conner had probable cause to believe Mr. Moss had committed a felony involving the infliction or threatened infliction of serious bodily injury;

42

i.  They failed to ensure Defendant Sgt. Waddell and Defendant Cpl. Conner had probable cause to believe Mr. Moss posed a threat of serious bodily injury to Defendant Sgt. Waddell and Defendant Cpl. Conner or others unless immediately apprehended;

j.  To engage, condone, ratify, tolerate, and permit a culture and practice where African-American/black citizens are targeted for more aggressive police interaction on the basis of race;

k.  To engage, condone, ratify, tolerate, and permit a culture and practice where African-American/black citizens are subjected to a higher propensity to use deadly force when compared the White citizens on the basis of race;

l.  To allow, tolerate, and/or encourage a "code of silence" among their deputies, whereby a deputy does not provide adverse information against a fellow deputy; and

m.  And in other ways which will be discovered during this litigation.

316.  At the time of the above-described series of events it was the custom, practice, or policy of Defendant Anderson County and the Jellico Police Department to inadequately supervise and train , thereby evidencing a deliberate indifference to Mr. Moss' constitutional rights.

317.  The need for properly training ASCO deputies and Jellico Police officers is obvious, and the lack of training was so inadequate that it was likely to result in violating the constitutional rights of individuals, including Mr. Moss.

318.  Defendant Anderson County's failure to supervise and provide ASCO deputies constituted a tacit authorization of the offensive acts.

## REQUEST FOR
## RELIEF

**WHEREFORE**, these premises considered, Plaintiffs pray:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiffs be entered against the Defendants on each count.

4. That Plaintiffs be awarded nominal damages on all counts.

5. That Plaintiffs be awarded compensatory damages in an amount determined by the jury.

6. That Plaintiffs be awarded thirty million dollars ($30 million) in punitive damages.

7. That Plaintiffs be awarded attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiffs be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiffs be awarded all other relief to which it may appear they are entitled in the interests of justice.

Respectfully submitted,

LAW OFFICES OF LUVELL L. GLANTON, PLLC

/s/ Luvell L. Glanton
LUVELL L. GLANTON, ESQ., BPR #014172
915 Jefferson Street, 2nd Floor
Nashville, Tennessee 37208
Tel: (615) 244-4511
FAX: (615) 244-7226
Email: glantonfirm@gmail.com
glantonfirm@gmail.com

***ATTORNEY FOR PLAINTIFFS***

44